# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 3, 2014

## STATE OF TENNESSEE v. SHAWN O'NEAL TALIAFERRO

**Appeal from the Circuit Court for Haywood County**
**No. 6740     Clayburn Peeples, Judge**

_____

**No. W2013-01620-CCA-R3-CD  - Filed November 24, 2014**

_____

A Haywood County jury convicted the Defendant, Shawn O'Neal Taliaferro, of second degree murder and possession of a weapon by a convicted felon. The trial court sentenced the Defendant, as a Range II offender, to serve consecutive sentences of forty years for the second degree murder conviction and four years for the possession of a weapon by a convicted felon conviction, for a total effective sentence of forty-four years. On appeal, the Defendant asserts that: (1) the evidence is insufficient to support his convictions; (2) the trial court improperly admitted hearsay evidence; and (3) the trial court erred when it sentenced the Defendant as a Range II offender and imposed consecutive sentences. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Samuel J. Muldavin, Memphis, Tennessee, for the Appellant, Shawn O'Neal Taliaferro.

Herbert H. Slatery, III, Attorney General and Reporter; J. Ross Dyer, Senior Counsel; Garry G. Brown, District Attorney General; and Jerald M. Campbell, Assistant District Attorney General for the Appellee, State of Tennessee.

## OPINION
### I. Background and Facts

This case arises from the shooting death of David Lee Capers ("the victim"), on

September 3, 2010. A Haywood County grand jury indicted the Defendant for first degree murder and possession of a weapon by a felon. At a trial on the charges, the parties presented the following evidence: Dr. James Caruso, a Shelby County medical examiner, testified as an expert witness in the field of pathology. Dr. Caruso confirmed that he performed the autopsy on the victim. Referencing photographs taken at the time of the autopsy, Dr. Caruso identified two contact gunshot wounds, one to the victim's temple and one to the victim's forehead. Dr. Caruso explained that a contact wound occurs when a weapon is held up against the skin when fired. Dr. Caruso stated that, in his opinion, the victim was shot six times total. He observed seven gunshot wounds on the victim, but concluded that one of the wounds was the result of the re-entry of a bullet. Dr. Caruso stated that he also found what he believed to be "an old bullet" in the victim's right arm.

Dr. Caruso testified that the victim's cause of death was gunshot wounds to his head. He stated that, based on the area of the brain in which the victim sustained injury, the victim could have had some ability to move after being shot prior to his death. Dr. Caruso testified that the manner of death was homicide.

Dr. Caruso testified that his examination revealed abrasions on the victim's upper extremities, back, and hip. Dr. Caruso said that toxicology testing revealed an elevated blood alcohol "too high to be legally driving a vehicle" and the presence of cannabinoid, an active ingredient in marijuana.

William Whitson, a Lauderdale County Sheriff's Department deputy, testified that he was dispatched to the Ripley Police Department on September 3, 2010, to speak with a subject who had witnessed a crime in Lauderdale County. When he arrived, he met with the subject, Kendell Turner, who was "extremely upset and frightened." Mr. Turner advised Deputy Whitson that he had been in a van with the Defendant, the victim, and "a Vaughn subject." Mr. Turner recounted to the officer that, while driving down a road, the Defendant shot the victim twice in the head. Deputy Whitson said that he instructed Mr. Turner to write out his statement and requested that deputies be sent to the area where Mr. Turner alleged the victim had exited the van. After writing his statement, Mr. Turner advised Deputy Whitson that he also knew the residence where the Defendant might be found. After driving by the residence, Deputy Whitson began searching the area where Mr. Turner last saw the victim. After crossing over into Haywood County, Deputy Whitson observed blood on the roadway where it appeared "something had been dragged."

Deputy Whitson testified that, at this point, he stopped the car, and Mr. Turner became "very upset" and began crying. Deputy Whitson said that he waited for another deputy to arrive and then walked approximately fifty yards down the road before finding the victim's body in an eight to ten foot ditch off the side of Highway 19. He described the area as "very

grown up," concealing the victim's body. He estimated that the victim would have been there for "quite awhile" before being discovered had authorities not been actively looking for his body.

Kendell Turner testified that the victim was his "best friend." He stated that he was also friends with the Defendant and Joseph Vaughn. Mr. Turner recalled Labor Day weekend 2010. He said that the victim had come into town, and a group gathered at Paul Haynes's house. He said that the Defendant, the victim, and Joseph Vaughn were all present. At some point, these four men decided to leave Mr. Haynes's house to go see the victim's sister. Mr. Turner explained that he drove the men in his mother's van to Northcrest where the victim's sister, "Ashley," lived. They remained there for twenty to thirty minutes before going to a liquor store. Next, the men decided to go and get money from the victim's mother.

Mr. Turner testified about the seating arrangement in the van as they drove to see the victim's mother. He said that he was in the driver seat, the victim was seated in the front passenger seat, the Defendant was seated in the back passenger seat directly behind the victim, and Joseph Vaughn was seated in the passenger seat directly behind the driver. As he drove down Highway 19 toward Brownsville, the victim was talking about his life in Decatur, Illinois, and showing pictures of his baby when Mr. Turner heard a "pow" like someone had "slapped [the victim] in the head." Mr. Turner stated that upon hearing the "loud clap noise" he reflexively applied the car brakes. He looked over at the victim, who was slumped over, and saw blood coming from the right side of the victim's head. He said that he saw the Defendant pulling "[a] little chrome gun" away from the victim's head.

Mr. Turner testified that he continued driving and then heard a gun fired multiple times. He applied the brakes again slowing the van, and the victim jumped out of the van. Mr. Turner recalled that the Defendant stated "y'all know what this mother f**ker did to me." He said that he believed the Defendant was referencing "bad blood" between the victim and Defendant. In response to the victim's flight, the Defendant said "f**k that mother f**ker ain't dead," and he ordered Mr. Turner to stop. Mr. Turner said that he turned the van around and headed back toward Ripley telling the Defendant that the victim was dead. The Defendant continued to tell Mr. Turner to stop the van. Mr. Turner did not stop and continued driving back toward Ripley while the Defendant searched for bullets or shells in the van. The Defendant told Mr. Turner to explain the blood in the van to his mother by saying that the victim had borrowed the car.

Mr. Turner testified that he assured the Defendant he would not "tell on [him]" and told the Defendant he "just want[ed] to get out." Mr. Turner stopped the car, he and Joseph Vaughn exited the van, and the Defendant drove away. Mr. Turner stated that he never saw the van again but that he was told that "it got burnt up." Mr. Turner said that one of Mr.

Vaughn's relatives came and picked up him and Mr. Vaughn, and that he later went to the police about the shooting.

On cross-examination, Mr. Turner testified that earlier on the day of the shooting he had been at Mary Nabers's house playing Xbox, drinking, and smoking marijuana. He said that he had not been employed for four or five years. Mr. Turner agreed that he had felony convictions for possession of cocaine and aggravated assault.

Joseph Vaughn testified that he was friends with the Defendant, the victim, and Mr. Turner. Mr. Vaughn recalled that he and the Defendant were at Paul Haynes's home on September 3, 2010, when the victim and Mr. Turner arrived in a van. At some point, he, the Defendant, the victim, and Mr. Turner drove to Northcrest to see the victim's sister. Mr. Vaughn said that Mr. Turner drove the van, the victim sat in the front passenger seat with the Defendant seated directly behind him, and he sat behind Mr. Turner. After visiting with the victim's sister, the men left Northcrest to go see the victim's mother. Mr. Vaughn said that the men were seated in the same positions in the vehicle as he had earlier described. He recalled that as they drove down Highway 19, they talked and listened to the radio, "normal stuff," when the Defendant shot the victim. He said the Defendant fired one or two shots at first, followed by five or six more gun shots. Mr. Vaughn stated that he observed the Defendant firing the gun and that he threw up his hands because he "didn't know what was going on."

Mr. Vaughn testified that he asked the Defendant what he was doing, and the Defendant replied that the victim had "crossed him." Mr. Vaughn said that he believed the Defendant was referring to an incident that occurred in Illinois in 2008. He confirmed that he observed the victim bleeding from his head. After the first round of gunfire, the victim was "slumped over on the window." Mr. Vaughn said that the victim turned around and asked the Defendant why the Defendant shot him and that the Defendant then fired the gun for the second time at the victim. The victim and the Defendant wrestled over the gun and then the victim opened the van door and "fell out." Mr. Vaughn said that the van was moving at the time the victim exited but not "very fast." He said that Mr. Turner was crying and driving at the time. He described Mr. Turner as "in shock." Mr. Turner turned the van around at his next opportunity and began to drive back to Ripley. Mr. Vaughn said that the Defendant wanted Mr. Turner to stop the van to find the victim but that Mr. Turner did not stop.

Mr. Vaughn testified that, once they arrived in Flippin, Mr. Vaughn and Mr. Turner "jumped out and ran." Approximately twenty minutes after he and Mr. Turner fled from the van, the Defendant called Mr. Vaughn's cellular telephone to ask where Mr. Turner was. He said that he and Mr. Turner waited on the side of the road until his cousin, Lester, came to

get them.

Mr. Vaughn testified that he observed the Defendant shooting "toward the [victim's] face area." He said that the Defendant fired the gun until he ran out of bullets.

Ashley Allen, the victim's sister, testified that she had known the Defendant, Mr. Vaughn, and Mr. Turner "all [her] life." Ms. Allen stated that her brother called her on the morning of September 3, 2010, when he arrived in Memphis. She said that she saw the Defendant that morning on Walker Street and informed him that her brother was on his way to Ripley. Ms. Allen denied any knowledge of "bad blood" between the victim and the Defendant. Later in the day on September 3, 2010, the victim came to her home for fifteen to twenty minutes. Ms. Allen identified a photograph the victim had taken of her during this visit. She pointed out where the Defendant was located in the photograph behind her. She recalled that the men arrived in a white van with Mr. Turner driving, the victim in the front passenger seat, and the Defendant and Mr. Vaughn in the back seat. Ms. Allen stated that this was the last time she saw the victim.

Cathy Ferguson, a Tennessee Bureau of Investigation ("TBI") special agent, testified that she responded to the area of Haywood and Lauderdale County line on Highway 19 to assist in a homicide investigation. She said that the victim's body was found a half mile across the county line into Haywood County. Agent Ferguson identified photographs taken at the crime scene. She said that there was an "intermittent" blood trail, seventy-two feet in length, along the roadway leading up to where the victim's body was found. She testified that she measured the distance between the road and the top of the victim's head and that it was thirty feet. Agent Ferguson agreed that had Mr. Turner not provided information on where to search, it would have taken "some time" to find the victim due to the overgrowth of ragweed and grass along the road. She said the victim's body would not have been visible from a car driving along Highway 19.

Agent Ferguson testified that a bus ticket was found in one of the victim's pockets. The bus ticket indicated that the victim had arrived in Memphis, Tennessee, on September 3, 2010, at 8:25 a.m. from Decatur, Illinois. The victim's Illinois driver's license was also found on his person. While at the scene, Agent Ferguson learned that the Lauderdale County Sheriff's Department had received a report of a van on fire in a field in Lauderdale County. The owner of the vehicle was determined to be Mr. Turner's mother, Mary Turner. Agent Ferguson stated that the fire department was dispatched to the fire at 10:20 p.m. on September 3, 2010. Agent Ferguson described the status of the van as "basically incinerated." She identified a cartridge casing that was recovered from the passenger front area of the burned van but stated she found nothing else of "evidentiary value."

Agent Ferguson testified that the Defendant had already been taken into custody by the time she arrived at the crime scene. She was not involved in the Defendant's arrest but interviewed him on September 4, 2010. She stated that the Defendant waived his rights and agreed to speak with her. She recalled that the Defendant had an eighth grade education and could not read or write other than his own name, so Agent Ferguson read the *Miranda* rights to him. The Defendant appeared to understand the rights and signed the waiver form. As Agent Ferguson began asking the Defendant questions, he became "very agitated." The Defendant denied any involvement in the victim's death or recently having seen the victim. At some point he admitted to having seen the victim on September 3, 2010. He said that he, the victim, and Mr. Turner drove around in Mr. Turner's mother's van. He said they went to Paul Haynes's house and the victim's sister's home before he was dropped off at his home between 8:00 and 9:00 p.m. Agent Ferguson said that she told the Defendant she did not believe he was being truthful and that the Defendant became "very aggravated" and "upset," requesting to be returned to his jail cell.

Agent Ferguson testified that the victim's cell phone was recovered from the Medical Examiner's office along with his clothing. Agent Ferguson said that the last activity on the victim's cell phone was at 7:41 p.m. on September 3, 2010. Agent Ferguson stated that she also obtained the Defendant's cell phone and call records. She noted that there were three significant gaps in the Defendant's telephone usage on September 3, 2010, one of which was during the time frame that the victim was killed. She said that the Defendant received a telephone call at 7:25 p.m. and then 8:15 p.m. was the next time he used his cellular telephone to place a call. The Defendant made or received a total of 159 telephone calls on September 3, 2010. The telephone records showed that the Defendant called Mr. Turner at 8:20 p.m. and Mr. Vaughn at 8:27 p.m. Agent Ferguson said that, in reviewing the telephone records, she also noted a significant increase in phone calls from 8:15 p.m. until 10:20 p.m., when the van was found burning. She stated that, in her experience, when a crime has been committed there is either an increase in cell phone usage or gaps in cell phone usage. She explained that the gap in telephone usage from 7:25 p.m. to 8:15 p.m. was consistent with the time frame authorities believed the victim was shot and that the increased cellular telephone usage at 10:20 p.m. would be consistent with the Defendant needing to obtain a ride after burning the van in the field.

Teri Arnie, a TBI forensic scientist, testified as an expert witness in the field of firearms identification. Agent Arnie testified that she examined a fired cartridge case found in the interior of the van and six fired bullets recovered from the victim's body. As to the fired cartridge case found in the van, Agent Arnie was able to determine that the case was a Winchester 25 auto caliber cartridge case. Agent Arnie said that the bullets recovered from the victim's body were also 25 caliber and consistent with the cartridge case recovered from the van.

Robert P. Miles, III, a TBI forensic scientist, testified as an expert witness in the field of gunshot primer residue analysis. Agent Miles stated that he performed an analysis on the Defendant's clothing worn the night of the shooting. He said that his examination and analysis of the clothing revealed the presence of particles unique to gunshot primer residue. He noted that the particles were located on the Defendant's hat, indicating that the hat was near a gun when it was fired or came into contact with a recently fired gun.

Jennifer Shipman, a TBI forensic scientist, testified as an expert in the field of serology and DNA analysis. Agent Shipman tested six swabs containing blood taken off the roadway. The DNA profile from the swabs matched the blood standard for the victim.

Frank Hubbard, a Decatur, Illinois Police Department detective, testified that in October 2007, he investigated a shooting crime involving the victim and the Defendant in Illinois. Initially, the victim denied involvement in the shooting, but later, through his attorney, identified the Defendant as the shooter. Subsequently, the Defendant was charged and convicted of a felony in Illinois.

The State submitted a certified copy of the Defendant's prior aggravated assault conviction in Lauderdale County Circuit Court in support of Count 2 of the indictment, possession of a weapon by a convicted felon.

Markee Barbee testified on the Defendant's behalf. Mr. Barbee stated that he was thirty-four years old and lived in Ripley, Tennessee. He said that he had been convicted of felony possession of marijuana with the intent to sell. Mr. Barbee stated that he knew Mr. Vaughn, Mr. Turner, the Defendant, and the victim "from around town." He said that he did not see any of these men, except for the Defendant, on September 3, 2010. He recalled that the Defendant was on "Eddie's porch" "right at dark" and the two began to talk. Mr. Barbee told the Defendant he was going to a street festival in Halls, Tennessee, and the Defendant joined him. They remained in Halls until 10:00 or 10:30 p.m. The Defendant left in a separate car, and Mr. Barbee did not see the Defendant again that night.

On cross-examination, Mr. Barbee agreed that the Defendant was his first cousin. As to the specific time he first saw the Defendant and went to Halls, he did not know and maintained that it was "dark." He estimated that they were in Halls "probably hour and a half probably two hours."

Jennifer Moody testified that she was friends with the Defendant's wife. She stated that she saw the Defendant on September 3, 2010, in Ripley, Tennessee. She explained that she and the Defendant's wife attended church together in Dyersburg. She stated that she drove the Defendant's wife home after the service ended at 10:35 p.m. She estimated that

the drive time from the church to the Defendant's home was approximately a half hour. When they arrived, the Defendant's wife exited the car and spoke to the Defendant who was in the yard working on a car.

On cross-examination, Ms. Moody stated that she arrived at the Defendant's home "a little bit after 11:00" p.m. and that she observed the Defendant and his wife interact before leaving. She stated that she could not explain why the Defendant would have called his wife at 11:17 p.m. and twice at 11:23 p.m., given her observation of their interaction "a little bit after 11:00."

Based on this evidence, the jury convicted the Defendant of the lesser-included offense of second degree murder and possession of a weapon by a convicted felon. The trial court sentenced the Defendant as a Range II offender to serve forty years for the second degree murder conviction and four years for the possession of a weapon by a convicted felon conviction. The trial court ordered these sentences to be served consecutively, for a total effective sentence of forty-four years in the Tennessee Department of Correction. It is from these judgments that the Defendant now appeals.

## II. Analysis

The Defendant asserts that: (1) the evidence is insufficient to support his convictions, (2) the trial court improperly admitted hearsay evidence, and (3) the trial court erred when it sentenced the Defendant as a Range II offender and imposed consecutive sentences.

### A. Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his convictions. He asserts that the lack of physical proof tying him to the crime and the inconsistency of the eye witnesses' testimony at trial precludes a verdict of guilt. The State responds that there is sufficient evidence upon which a jury could find the Defendant guilty beyond a reasonable doubt of second-degree murder and possession of a handgun by a convicted felon. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial

evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn.

2000) (citations omitted).

As charged in this case, "[s]econd degree murder is . . . [a] knowing killing of another." T.C.A. § 39-13-210 (2012). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." *Id*. § 39-11-302(b). "To establish that a defendant committed a second degree murder, the State has the burden of proving beyond a reasonable doubt that (1) the defendant killed the victim, and (2) the defendant committed the killing with a 'knowing' state of mind." *State v. Parker*, 350 S.W.3d 883, 904 (Tenn. 2011).

The evidence, considered in the light most favorable to the State, shows that the Defendant was with the victim on the evening of September 3, 2010. Mr. Turner drove his mother's white van while the victim sat in the front passenger's seat with the Defendant seated directly behind him. The men had been to Northcrest to visit the victim's sister and were driving on Highway 19 toward Brownsville when the Defendant shot the victim numerous times. The victim opened the car door, fell out, and died along the roadside due to the gunshot wounds. The victim's body was found near where he fell out of the car. Thereafter, the Defendant took possession of Mr. Turner's mother's white van, which was later found burning in an open field. This is sufficient evidence upon which a jury could find the Defendant knowingly killed the victim.

The Defendant contends that the inconsistencies in the testimony of the witnesses at trial necessitated that "no reasonable jury" could have accredited their testimony. We reiterate that the trier of fact resolves questions concerning the credibility of witnesses, the weight and value of the evidence, and all factual issues raised by the evidence; an appellate court should not re-weigh or re-evaluate the evidence. *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *Bland*, 958 S.W.2d at 659. Furthermore, a verdict of guilt by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in favor of the prosecution's theory of the case. *Bland*, 958 S.W.2d at 659. In this case, by its verdict, the jury accredited the State's witnesses' testimony and resolved any inconsistencies in favor of the State's theory that the Defendant committed the offenses for which he was convicted.

Accordingly, we conclude that the proof is sufficient to support the Defendant's conviction beyond a reasonable doubt. The Defendant is not entitled to relief.

### B. Character Evidence

The Defendant contends that the trial court improperly admitted Detective Hubbard's testimony about the victim's statements to Illinois police. He asserts that the testimony was improperly admitted as character evidence "under the guise of motive." The State responds

that, because the probative value of the testimony far outweighed any prejudicial effect toward the Defendant, the trial court did not abuse its discretion in admitting the testimony. We agree with the State.

"Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion." *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004). The Tennessee Rules of Evidence provide that all "relevant evidence is admissible," unless excluded by other evidentiary rules or applicable authority. Tenn. R. Evid. 402. Of course, "[e]vidence which is not relevant is not admissible." *Id*. Relevant evidence is defined as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. at 403.

"Evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person in order to show action in conformity with that character trait. *Id*. at 404(b). Such evidence may be admissible, however, for "other purposes." *Id*. Our Supreme Court has determined that such "other purposes" include demonstrating motive or intent. *State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). Such evidence is admissible for other purposes, provided that the trial court: (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on evidence of prior crimes, wrongs, or acts. *State v. James*, 81 S.W.3d 751, 758 (Tenn. 2002). When a trial court substantially complies with the procedural requirements of Rule 404(b), the standard of appellate review of the trial court's decision is abuse of discretion. *See State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *James*, 81 S.W.3d at 759. If the strict requirements of the rule are not substantially observed, the reviewing court gives the trial court's decision no deference. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

In the present case, the Defendant objected to Detective Hubbard's testimony regarding the 2008 shooting in Illinois, arguing that the testimony's probative value was outweighed by the prejudice to the Defendant. The State maintained that, whether or not the victim's statement to Illinois police implicating the Defendant was truthful, the testimony

showed a motive for the Defendant's shooting the victim. The trial court held a jury-out hearing and, after hearing Detective Hubbard's testimony and viewing the certified copy of conviction for the case, ruled that the testimony was admissible. The trial court stated its reasoning as follows:

> After hearing the proof in this case and I assume I've heard it all[,] the establishment of a motive in view of the otherwise inexplicable nature of this crime becomes extremely crucial to the State's case.
>
> And therefore the probative value of this testimony is extremely high.
>
> . . . .
>
> [W]hat we've got thus far is testimony that the Defendant was riding along with a guy and for no other apparent reason shoots him dead [ ] six times.
>
> Two of them contact wounds to the head. And the jury - - anybody who hears this has got to be saying why would he do that. This is a guy they're out riding around with.

The trial court held a jury-out hearing, considered the relevant factors, and concluded that the probative value of the testimony was not outweighed by the danger of unfair prejudice. We agree that the challenged testimony provided a background for the Defendant and the victim's relationship, which was indicative of the Defendant's motive for harming the victim. Mr. Turner's testimony suggested "bad blood" between the Defendant and the victim with no further explanation. Mr. Vaughn referenced an incident that occurred in Illinois in 2008 as the source of the "bad blood." Detective Hubbard's testimony provided the jury with a possible motive for the Defendant's violent conduct toward the victim.

Accordingly, we conclude that the trial court did not abuse its discretion in admitting Detective Hubbard's testimony. The Defendant is not entitled to relief as to this issue.

### C. Sentencing

The Defendant challenges the trial court's classification of him as a Range II offender based upon an Illinois conviction for mob action. The Defendant also argues that the sentence is too lengthy for the offense and the trial court should not have ordered consecutive sentencing. The State responds that the Defendant has failed to show that the trial court abused its discretion in ordering an effective sentence of forty-four years. We agree with the State.

The Tennessee Criminal Sentencing Reform Act of 1989 and its amendments describe the process for determining the appropriate length of a defendant's sentence. Under the Act, a trial court may impose a sentence within the applicable range as long as the imposed sentence is consistent with the Act's purposes and principles. T.C.A. § 40-35-210(c)(2), (d) (2010); *see State v. Carter*, 254 S.W.3d 335, 343 (Tenn. 2008).

In *State v. Bise*, the Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" 380 S.W.3d 682, 708 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise,* 380 S.W.3d at 709-10. In other words, so long as the trial court sentences a defendant within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

### A. Range and Length

The Defendant argues that the trial court treated the Defendant's Illinois conviction for mob action, a Class 4 felony, as a Class C felony. He contends that the conviction should have been considered as a Class D felony based upon the sentencing range in Illinois for a Class 4 felony conviction. The State responds that the trial court properly sentenced the Defendant as a Range II offender.

To be classified as a multiple offender, a defendant must have between two and four prior felony convictions within the conviction class, a higher class, or within the next two lower felony classes. T.C.A. § 40-35-106(a)(1) (2014). Here, the trial court found that the Defendant had two prior Class C felonies: a Tennessee Class C felony conviction for aggravated assault and an Illinois Class 4 felony conviction for mob action. Prior convictions under the laws of any other state, government or country, may be considered in determining the offender range. T.C.A. § 40-35-106(b)(5). If a felony from another jurisdiction is not a named felony in Tennessee, Tennessee courts should use the elements of the offense in determining the classification of the offense. *Id.*

The Defendant was convicted of a Class 4 felony for mob action. According to the Illinois Code, "a person commits mob action when he or she engages in the knowing or reckless use of force of violence disturbing the public peace by 2 or more persons acting together and without authority of law." 720 ILL. COMP. STAT. 5/25-1. If the violence inflicts injury to a person or to property of another, this offense is a Class 4 felony. *Id.* The indictment related to the offense states, "[The Defendant] knowingly, while acting with another person without authority of law, struck and shot Jason Washington."

The Defendant argues that the Illinois sentencing range for a Class 4 felony is more consistent with a Tennessee Class D felony rather than a Class C felony. Our statute, however, requires the trial court to compare "the elements of the offense," not sentencing ranges. T.C.A. § 40-35-106(b)(5). Therefore, we conclude that the trial court properly compared the elements of the offenses rather than the sentencing ranges in classifying the Defendant's prior conviction for mob action as a Class C felony.

As to the Defendant's contention that the sentence imposed for his second-degree murder conviction was excessive, we disagree. The Defendant was convicted of a Class A felony and qualified as a Range II offender. Accordingly, the trial court was required to sentence the Defendant within the range of twenty-five to forty years. *See* T.C.A. § 40-35-112(b)(1). The trial court found the following enhancement factors applicable: (1) a history of criminal convictions or behavior in addition to those necessary to establish the range; (2) the Defendant treated the victim with exceptional cruelty; (3) a firearm was employed during the commission of the offense; (4) the Defendant had no hesitation about committing a crime when the risk to human life was high; and (5) the Defendant was on probation at the time of the offense. *See* T.C.A. §40-35-114(1),(5),(9),(10), and (13)(C). After considering the appropriate enhancement and mitigating factors, the trial court sentenced the Defendant to forty years.

The record reveals that, in addition to the two felony convictions qualifying the Defendant as a Range II offender, the Defendant has four additional convictions. The Defendant shot the unarmed victim in the head from behind at contact range in an enclosed vehicle with two other passengers. The victim then turned and addressed the Defendant, who he had spent the afternoon with socializing, and the Defendant responded with another round of gunfire. The victim exited the van, covering approximately fifty yards before collapsing and dying alone in a ditch along Highway 19. Finally, the record shows that the Defendant was on supervised probation related to his Illinois conviction at the time of this offense. We conclude that the trial court's application of the enhancement factors and the ultimate sentencing decision was supported by the record. Therefore, the trial court did not abuse its discretion in ordering the maximum sentence. The Defendant is not entitled to relief as to this issue.

## B. Consecutive Sentences

The Defendant asserts that the trial court abused its discretion by imposing consecutive sentences. The State responds that the record supports the imposition of consecutive sentences. We agree with the State.

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence. As it relates to this case, the trial court found the following criteria applicable:

> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (6) The defendant is sentenced for an offense committed while on probation;

T.C.A. § 40-35-115(4) and (6). These criteria are stated in the alternative; therefore, only one need exist to support the imposition of consecutive sentencing. *See id.*; *State v. Denise Dianne Brannigan*, No. E2011-00098-CCA-R3-CD, 2012 WL 2131111, at *19 (Tenn. Crim. App., at Knoxville, June 13, 2012), *no Tenn. R. App. P. 11 application filed*. The imposition of consecutive sentencing, however, is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed [.]" T.C.A. § 40-35-103(2), (4).

We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013). Our review of the record reflects that, while the trial court did not address the *Wilkerson* factors in applying the dangerous offender criteria, the record supports that the sentence imposed is necessary to protect the public and reasonably relates to the severity of the offense. *See State v. Wilkerson*, 905 S.W.2d 933, 938-39 (Tenn. 1995). Moreover, the trial court properly applied criteria (6), which is sufficient to support consecutive sentencing. Accordingly, we conclude that the sentence is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles of the sentencing statute. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the trial

court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE